## DAUBNEY v. HUGHES, appellant.

*Husband and wife — agreement to pay for wife's support — notice forbidding*
*credit to wife — effect of.*

The defendant's wife being epileptic and partially insane, he, with her con-
sent, agreed that she might live with the plaintiff (her father), and that he
would pay the latter what should be right for her support. The wife went
to the plaintiff's house, and continued to reside there without any objection
on the part of the defendant, her condition not improving, but growing
worse. While she was so residing with, and supported by the plaintiff, the
defendant published a notice in a newspaper, to the effect that his wife had
left his bed and board without just cause, and that he would pay no debts
*of her contracting* after that date. *Held*, (1) that the fair inference from the
circumstances was, that the plaintiff was to keep the defendant's wife while
her sickness lasted ; (2) that the facts were sufficient to show that the notice
was not intended to affect, and did not affect, the relations between the parties,
but was perfectly compatible with the continuance of the agreement; and, (3)
that the defendant's liability under it continued, notwithstanding the notice.

APPEAL from a judgment in favor of the plaintiff, entered upon the
verdict of a jury. The action was brought by Samuel Daubney
against Thomas S. Hughes to recover for board, medicine, medical
attendance and other necessaries furnished to the defendant's wife.

On the trial two motions to nonsuit the plaintiff were made and
denied, and exceptions taken. Exceptions were also taken to the
rulings and charge of the court, and to refusals to charge as
requested.

The other material facts are stated in the opinion.

*W. A. Beach & D. J. Mitchell*, for appellant.

*Garfield & Hoyt*, for respondent.

GILBERT, J. The plaintiff is the father of defendant's wife. The
wife being afflicted with epilepsy, which had rendered her insane to
a greater or less degree, the defendant consented that she might live
with the plaintiff, and agreed with the plaintiff that he would pay
him what should be right for her support. This occurred in Janu-
ary, 1870. The defendant denies that he agreed to pay the plaintiff,
but the verdict of the jury established the fact that he did. The

wife has continued to reside with the plaintiff ever since this agreement was made, and the uncontradicted evidence is, that her condition has grown worse and worse. The plaintiff recovered upon the agreement in a former action, which was commenced in March, 1871, for the board of the wife up to that time, and the defendant satisfied the judgment before the commencement of this action. It appears, that in October preceding the commencement of the former action, the wife came to the house of the defendant's sister, where he was boarding, when he was not there; that when the defendant returned he told her he was glad she had come back, and that he would receive her and take care of her. And it must, we think, be assumed that the defendant had made an arrangement with his sister, for the board of himself and wife at her house, for the evidence was offered and excluded by the court. The evidence does not show what reply was made by the wife, but the defendant's answer avers that she refused to live with him. It also appears that on the occasion last referred to, the wife's mother sent for her, and took her back to the plaintiff's residence; and that in March, 1871 the defendant caused a notice to be published in the newspapers of Syracuse, to the effect that his wife had left his bed and board without just cause, and that he would pay no debts of her contracting after that date. The plaintiff testified that he saw this notice in March, 1871.

There is no occasion to discuss the legal propositions advanced by the learned counsel for the defendant, namely, that in the absence of an agreement creating a special obligation or duty, a husband is not liable even for necessaries furnished his wife, while she is living apart from him without his consent, unless there be legal cause for the separation, arising from his own misconduct; and that where a separation has taken place without fault on either side, the husband can, at any time, put an end to his wife's authority to bind him, by offering in good faith to resume the marital relations, and making suitable provision for her maintenance. These rules are familiar and need no support, but we think they do not govern this case. Nor would any one seriously contend that a plaintiff who had enticed a man's wife away from him, could recover for necessaries furnished her during a separation so produced by his own wrong.

The verdict of the jury has established the fact that the defendant agreed with the plaintiff, with the consent of his wife, so far as she was capable of assenting, and for her benefit, that they should

live separate for an indefinite period, and that the defendant should pay what should be right for her support. Assuming, but not admitting, that the defendant might, by an act of his own, without the consent of his wife, and when there had been no change in the circumstances which induced the separation, abrogate such an agreement, the first question is, whether the publication of the notice in March, 1871, with proof that the plaintiff saw it, had that effect.

The occasion for publishing the notice is stated in it to have been the fact that the defendant's wife had left his bed and board without just cause, and the notice was that the defendant would pay no debts of *his wife's* contracting. The only event to which the notice referred is proved to have occurred in October, 1870, a period of more than five months before the notice was published. During all that period the wife was living with her father, the plaintiff, precisely in the manner she had been living before the alleged elopement occurred, a fact which was well known to the defendant.

The fair inference from the circumstances attending the arrangement made between the parties under which the wife was received by the plaintiff is, that he was to keep her while her sickness lasted. The evidence shows that her health had not improved, and that there was the same necessity for her remaining with her parents that there had been for her going to them originally. The defendant permitted her to remain down to the commencement of this action, without intimating to them a wish that she should return to him, or of an unwillingness on his part to abide by the agreement. The former action embraced a claim for board from October, 1870, when the alleged elopement occurred, to the time when the notice was published. It does not appear that the defendant resisted that claim on the ground that any thing had occurred that affected the agreement, but on the contrary he paid it without objection, so far as the evidence shows. These facts are sufficient to prove that the notice was not intended to affect, and did not affect, the relations between the parties. It was perfectly compatible with the continuance of the agreement, and there is no ground for supposing that it was intended for the plaintiff. If it was published with an honest purpose, the object must have been to warn the general public against future transactions, and not to annul a subsisting contract. Again ; the notice was that the defendant would pay no debts of *the wife's* contracting. The debt in suit was not contracted by

the wife, but by the defendant himself. This seems to us a con-
clusive answer to the argument founded on the notice.

With respect to the occurrences in October, 1870, on which the
counsel for the defendant appeared to put so much stress, we cannot
find any thing of legal import in them. In the first place it is
reasonably clear that the defendant did not act in good faith in
the offer made to take his wife back. Putting aside the necessity
which existed, that she should have, to a greater or less extent, the
care of a person of her own sex, and that the defendant had before
been compelled, probably on this account, to make provision for her
reception into an asylum, it appears that the wife was not sent for,
but came of her own volition to the house of the defendant when
he was absent ; that when the defendant came in he told her he was
glad she came back ; that he would receive her and take care of
her ; that the wife's mother soon sent for her, when the wife asked
the defendant if she could go, to which the defendant replied, " do
as you please;" that she then asked him if he should be angry if
she should go, and that he answered " no ;" whereupon the wife
went out and walked home with her mother, without any remon-
strance from the defendant. It is very evident from these and other
facts before stated, that he acquiesced in her remaining away from
him from that time forward. During much of that period he was
engaged in seeking a divorce from his wife in another State, and there
is nothing whatever after she left him in October indicating a desire
on his part that she should return to him, or to resume, in any way,
marital relations with her. The defendant's conduct may have
been influenced by the personal treatment he received from his
wife's mother; but after making due allowance for that, there
remains enough to produce conviction that his real desire was to
become free from the marriage tie, and from the burden of his wife's
maintenance. An offer to take a wife back, in whatever language
couched, made under such circumstances, can have no legal effect.
The law requires that the husband's conduct show sincerity, and
that his intentions be *bona fide*. *Walker* v. *Laighton*, 31 N. H. 111.

We perceive nothing warranting the inference that the wife was
enticed away from her husband by the procurement of the plaintiff,
and no complaint is made of any acts done by him personally. It
does not appear that Mrs. Daubney knew that the husband had inti-
mated a wish that his wife should return, or that she had any rea-
son to believe that, in sending for her daughter and taking her home,

she was doing wrong. The conduct of a parent in such a case is not to be viewed in the same light as that of a stranger. "A father's house," says Chancellor KENT, "is always open to his children, and whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum." *Hutcheson* v. *Peck*, 5 Johns. 196, 210. This, of course, does not justify the parent in hostile interference against the husband, but nothing of that kind can be attributed to the plaintiff.

These remarks, if correct, dispose of the exceptions taken upon the trial, and require that the judgment be affirmed, with costs.

*Judgment affirmed.*